**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil Action No. 5:23-cv-728**

| | | |
|---|---|---|
| SAMUEL GERALD, | ) | |
| | ) | |
| Plaintiff, | ) | <u>COMPLAINT</u> |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| vs. | ) | |
| | ) | |
| | ) | |
| PALZIV NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

NOW COMES Plaintiff Samuel Gerald ("Plaintiff"), by his attorneys Ekstrand & Ekstrand LLP, whose offices are located at 110 Swift Avenue, Durham, North Carolina 27705, and Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleging upon knowledge with respect to himself, and upon information and belief as to all other matters, as follows:

## <u>PRELIMINARY STATEMENT</u>

1.     This action is brought by Samuel Gerald ("Plaintiff"), a Black male citizen of Franklin County, North Carolina, for damages based upon discrimination, termination and retaliation against Plaintiff for exercising his rights under NCGS §95-241 and 42 USC § 1981, under Title VII of the Civil Rights Act, and the American Disabilities Act with respect to compensation, terms, conditions, and privileges of employment in ways that deprive Plaintiff of equal employment opportunities and otherwise adversely affect Plaintiff's status as an employee.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter and the parties to this action pursuant to, among others, 28 USC § 1343 (3) and (4), 28 USC § 1331, and 42 USC § 2000e-5(f), this being a proceeding to enforce rights and remedies secured to Plaintiff by Title VII of the Civil Rights Act of 1964, 42 USC § 2000e et. seq. as amended and as amended by the Civil Rights Act of 1991; 42 USC § 1981, and the Americans with Disabilities Act.

3.      Jurisdiction is further invoked pursuant to 28 USC §§ 2201 and 2202, this being an action for declaratory relief declaring illegal the acts of Defendant complained herein in violation of rights secured to plaintiff by the several Civil Rights Acts and the Constitution.

4.      The Court has supplemental jurisdiction over Plaintiff's state-law claims, including those under N.C. Gen. Stat. § 95-243, N.C. Gen. Stat. § 7A, and N.C. Gen. Stat. § 95-21, pursuant to 28 U.S.C. § 1367.

5.      Venue is proper because, among other things, one of more of the discriminatory and retaliatory practices occurred within this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      Plaintiff filed a timely charge of retaliation with the North Carolina Department of Labor (NCDOL), file number 205302. The NCDOL issued a Right to Sue Letter on September 22, 2023. Plaintiff filed this action within ninety (90) days of receipt of the Right to Sue Letter and has by that complied with all jurisdictional requirements and has exhausted all administrative prerequisites before initiating this action.

7.      Plaintiff also filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 17, 2023. Plaintiff received his right to sue letter from the EEOC on or about December 15, 2023.

8.     Plaintiff resides in Louisburg, North Carolina. Plaintiff is a Black male who suffered a serious burn during his shift while working at Defendant Palziv North America, Inc. ("Defendant Palziv").  Plaintiff was also subjected to a racially hostile work environment and disability discrimination which ultimately resulted in his termination in or around August 2022.

9.     Plaintiff suffered from severe burns and a fractured hand when he was electrocuted at work during a shift at Defendant Palziv. Plaintiff's injuries qualify as legally cognizable disabilities and/or perceived disabilities.

10.     At all relevant times, Plaintiff was Defendant Palziv's "employee" within the meaning of all relevant federal, state, and local laws, including, but not limited to Title VII, Section 1981, the Americans with Disabilities Act ("ADA"). and the Retaliatory Employment Discrimination Act ("REDA").

11.     At all relevant times herein, Defendant Palziv employed more than 15 employees.

12.     Defendant Palziv is and was, at all relevant times herein, a corporation registered to do business in North Carolina.  Defendant Palziv's headquarters, where Plaintiff was employed, are located at 7966 NC-56, Louisburg, North Carolina 27549.

13.     Defendant Palziv is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State, and local laws, including but not limited to Title VII, 1981, the ADA, and all relevant North Carolina laws.

## FACTUAL BACKGROUND

### Plaintiff Begins Employment at Defendant Palziv and Excels in His Work

14.     In or around September 2018, Defendant Palziv hired Plaintiff as a Machine Operator working under Supervisor Shane Mendelson (hereinafter "Supervisor Mendelson").

3

15.     Plaintiff worked the night shift from 6 p.m. to 6 a.m. Monday through Thursday. Plaintiff was not scheduled or required to work on Fridays but could ask to come in if Defendant Palziv needed employees to complete shifts on Fridays.

16.     Supervisor Mendelson oversaw Plaintiff's work utilizing and maintaining an industrial extruder.  Supervisor Mendelson regularly praised Plaintiff's performance and never found fault in his work quality, safety precautions, or ethics.

### Plaintiff Observes and is Subjected to a Racist and Disparate Environment

17.     Plaintiff was happy to have a job but he noticed immediately that employees of color were treated far less well than White employees and held to an entirely different standard.

18.     Employees of color, especially Black employees, were routinely punished for infractions that White employees were not punished for.

19.     Upon information and belief, White employees were paid more, promoted more frequently and given better shifts than Black employees.

20.     White employees were offered overtime before Black employees.  Black employees were generally left with overtime that Defendant Palziv could not find a White employee to take.

21.     Especially disheartening, Black employees were often forced to do jobs that were supposed to be done by two employees on their own, while White employees were always assigned a "helper" and never did a two-person job on their own.

22.     Specifically, Plaintiff worked on a machine called an "Extruder," which sends out hot plastic weighing between 26-32 kilograms every three to five minutes.  During the three-to-five-minute intervals, the hot plastic has to be lifted and weighed, lifted again and pressed and then lifted again and molded, and then lifted again and then into the oven.  Even though the Extruder required and was always supposed to have a two-man team in order to timely move the heavy plastic, Plaintiff was regularly left on his own to figure out how to get the work done by himself.

23.     It was extremely unsafe for one person to perform the Extruder job.

24.     Other Black employees were regularly left to do two-man jobs on their own, but White employees always had a helper. Plaintiff regularly asked for a second person to be assigned to work the Extruder with him but his requests were always ignored.  Upon information and belief, he was labeled a troublemaker for asking to be treated fairly and in accordance with company policy.

## Defendant Palziv Implements a Points System to Penalize Employees

25.     In or around fall of 2018, shortly after hiring Plaintiff, Defendant Palziv implemented a "points" system in which they assessed points against employees as penalties for such things as tardiness.

26.     Upon information and belief, the point system was instituted so that Defendant Palziv could create a record to support a defense against accusations about discrimination and disparate treatment.

27.     When an employee committed an infraction, Defendant Palziv was supposed to add penalty points to the Employee's file.  If an employee accumulated too many penalty points, they were written up and sometimes fired.  Typically, an employee had to accumulate a minimum of 6 points to be fired.

28.     Just as they disparately assigned work based on race, Defendant Palziv also disparately assigned points based on race and the points system was mainly used to penalize people of color.

29.     Defendant Palziv frequently penalized Black employees with penalty points for missing work even when those employees called out from work sick, even when they visited a doctor, but did not regularly penalize White employees for calling out from sick, even when they did not visit a doctor.

5

30.     Defendant Palziv rarely penalized White employees with points and did not write them up or fire them for committing infractions such as coming in late.

31.     Defendant Palziv failed to provide information about points to its employees of color so that they could assess the fairness of the points or object to the validity of the points.

### Plaintiff Experiences a Racially Hostile Work Environment

32.     Plaintiff noticed that a majority of Defendant Palziv's supervisors and upper management were White employees while most of his co-workers were Black.

33.     Plaintiff observed that Black employees struggled to get promoted by Defendant Palziv, while White employees were promoted quickly into managerial positions.  Indeed, when Black employees could of and should have been promoted into open positions, Defendant Palziv almost always chose to hire a White person externally.

34.     Plaintiff observed that White members of management at Defendant Palziv were cold and hostile when interacting with Black employees but were kind and warm to White employees.

35.     Defendant Palziv gave Black employees more difficult and more dangerous work assignments on the line, and worse schedules than their White counterparts.

36.     Plaintiff specifically noticed that HR Representative Robin Newton ("HR Rep Newton") and Supervisor Mendelson were rude and dismissive to Black employees.

37.     Despite noticing these disturbing trends, Plaintiff worked hard to learn his new role and obtained a certification in safety for working with the industrial extruder and related chemicals.

38.     Plaintiff and the other employees of color regularly discussed the overt racism and disparate treatment but felt strongly that nothing would change-except that they would be fired if they spoke out about it.

**Plaintiff Reports Racial Discrimination**

39.     In or around fall of 2019, Defendant Palziv terminated Plaintiff's Black coworker for allegedly "getting too many" penalty points. The Black Coworker was unaware of when, how or why he had been given the points and questioned Defendant Palziv about the points. Defendant Palziv's managers refused to provide evidence of or details about his alleged wrongdoing.

40.     Around the same time, a White employee significantly crossed the penalty threshold with approximately 20 points, and, instead of firing him as they had fired the Black employee, he was moved to another department, without penalty.

**Plaintiff Objects to the Racial Discrimination and is Told to Mind His Business**

41.     Plaintiff was shocked at the obvious disparate application of the point system and became concerned about his own job. Plaintiff asked Supervisor Mendelson how many points he had and questioned why the Black employee had been treated so differently from the White employee.  Supervisor Mendelson warned him to "mind his business" and refused to tell him how many points he had.

42.     Plaintiff went to HR Rep Newton and asked if he had any penalty points.  HR Rep Newton told Plaintiff that he was assessed three penalty points for allegedly being late.  Plaintiff was not aware of any days that he had been late.  When Plaintiff told HR Rep Newton that he did not recall ever being late and asked HR Rep Newton to tell him the dates he was listed as late, she refused to do so and told him to ask Supervisor Mendelson.

43.     Plaintiff went back to Supervisor Mendelson and again tried to obtain information about his points. Supervisor Mendelson refused to give him any information.  When Plaintiff tried to explain that he was concerned about his points after seeing what happened to his Black co-worker, Supervisor Mendelson snapped at Plaintiff, "keep quiet and mind your own business." Plaintiff told Supervisor Mendelson that it wasn't right what they were doing with the points, and

that they weren't being applied fairly to everyone. Supervisor Mendelson snapped at Plaintiff again in a threatening way.

44.     It was clear that Plaintiff and other Black employees were expected to accept the racial disparity as a term and condition of keeping their jobs.

45.     Upon information and belief, Supervisor Mendelson told HR Rep Newton knew about Plaintiff's complaints about the racially disparate treatment.

## Defendant Palziv Retaliates Against Plaintiff
## For Complaining About Racial Discrimination

46.     Shortly after Plaintiff complained to Supervisor Mendelson about Defendant Palziv's disparate treatment, Supervisor Mendelson and HR Rep Newton started treating him with even more hostility.

47.     HR Rep Newton sometimes walked through the factory floor and would normally answer questions from employees. After he complained about racial disparity, however, when Plaintiff tried to ask her a question about pay incentives that the company was offering, she waved him away and walked away from him mid-sentence.  Plaintiff was humiliated.

## Defendant Palziv Obtains Federal Paycheck Protection Program Loan

48.     In or around early 2020, when the COVID-19 pandemic began, Defendant Palziv applied for a Federal Paycheck Protection Program Loan ("PPP").  In or around April 2020, Defendant Palziv received $1.8 million dollars as a PPP loan for payroll from the federal government.  Upon information and belief, the Small Business Administration forgave nearly $1.75 million dollars of Defendant Palziv's PPP loan.

## Defendant Palziv Lays Off Large Numbers of Black Employees During Pandemic

49.     In or around April 2020, Defendant Palziv closed down portions of its plant and laid off employees despite receiving the large PPP Loan to use to avoid mass layoffs at its factory.

50.     Upon information and belief, Defendant Palziv disproportionately laid off Black employees, including Plaintiff and Plaintiff's son because Defendant Palziv viewed White employees as more valuable than Black employees.

### Defendant Rehires Plaintiff and Plaintiff<br>Again Experiences a Racially Hostile Work Environment

51.     On or about February 7, 2022, manager Magnum Boone (hereinafter "Manager Boone"), a Black male, and one of the few Managers of color, rehired Plaintiff for the same position that he held before the 2020 layoff.

52.     Manager Boone reached out to Plaintiff to come back to Defendant Palziv because he was looking to rehire workers who did not need to be trained.

53.     Plaintiff went to Defendant Palziv for a required vision testing appointment. The Black, female employee giving the test expressed shock that he was there and told him she was "surprised to see him back." Confused, Plaintiff asked, "Why are you surprised to see me?" The employee giving the vision test responded, "Your file was marked 'Do not rehire', and your sons was too."

54.     Plaintiff asked Manager Boone about the remark in his file and Manager Boone confirmed that it was true but told Plaintiff that he ignored HR Rep Newton's comment in the file because he needed employees that were skilled at the work in the sections of the plant that were re-opening.

55.     Upon information and belief, Manager Boone re-hired several of the Black employees that Defendant Palziv laid off in 2020 even though HR Rep Newton had marked them as "do not rehire."

9

56. Upon information and belief, HR Rep Newton placed this mark on Black employees' files because she did not want to rehire Black employees, especially if they had complained about the racially hostile working conditions as Plaintiff had.

57. Defendant Palziv continued to treat Black employees as inferior to their White employees and once HR Rep Newton noticed that Manager Boone re-hired the Black employees that Defendant Palziv laid off, she quickly found ways to terminate Manager Boone's employment and the re-hired Black employee's employment or made their work environment so hostile that they quit.

58. Upon information and belief, HR Rep Palziv placed a target on Plaintiff's back as soon as she saw that he returned.

**Manager Boone is Retaliated Against for Re-Hiring Black Employees**

59. Shortly after Plaintiff returned to work for Defendant Palziv, he learned that Manager Boone applied for a promotion and had the qualifications to work in the role.

60. Defendant Palziv asked Manager Boone to train Mike Stewart ("Manager Stewart) a White employee, as his replacement for floor manager. Manager Boone assumed he had received the promotion, which came with a pay increase, so he trained Manager Stewart in his role. When Manager Boone completed the training, Defendant Palziv refused to promote Manager Boone or give him a pay increase. Manager Boone could not return to his former role because Manager Stewart replaced him, so Manager Boone was left to be demoted.

61. Upon information and belief, Black employees at Defendant Palziv are afforded less opportunities and have a much higher turnover rate than their White counterparts.

**Plaintiff Receives Several Perfect Attendance Incentive Awards**

62. Throughout Spring and Summer 2022, Plaintiff worked hard to avoid being assessed penalty points, especially because Defendant Palziv refused to give employees clear

answers about whether they had any points or substantiate the points they assessed against employees and because he knew that HR Rep Newton was looking for any excuse to oust him.

63.     Because Defendant Palziv did not shut off the industrial extruder between shift changes, Plaintiff routinely arrived to work approximately 5-10 minutes early to ensure that the shift changeover on the industrial extruder went over flawlessly.

64.     As a result of his efforts, Plaintiff received several gift cards as incentive rewards for "perfect attendance."

65.     HR Rep Newton handed out the incentive rewards to employees on the floor during their shifts.

66.     Plaintiff received two perfect attendance incentive awards on or around August 14, 2022, and August 21, 2022.

### Defendant Palziv Fails to Appropriately Maintain Equipment and Plaintiff Experiences Significant Injury

67.     On or about August 19, 2022, Plaintiff's shift supervisor instructed him to perform routine equipment maintenance on the industrial extruder, a task he had performed hundreds of times without error.

68.     At all times during the maintenance process, Plaintiff wore gloves and safety goggles. First, he switched off the electrical power to the machine and allowed it to cool.  Once the machine cooled, Plaintiff removed the machine faceplate and reached into the machine to start the maintenance. As he reached into the machine, Plaintiff was electrocuted.  The electric shock burned through his safety gloves.  Plaintiff suffered 3rd degree burns on his hand and arm.

69.     One of Plaintiff's co-workers witnessed the electrocution, and noticed the spark plugs on the industrial extruder machine were sparking, indicating that the machine continued to have power.  Plaintiff was in shock and wasn't sure what to do or how to react.  One of his co-

workers ran to get the shift supervisor on duty that night, Travis Wagoner ("Supervisor Wagoner"). Supervisor Wagoner came over to Plaintiff and asked him if he was ok. Supervisor Wagoner photographed Plaintiff's injuries, then treated and bandaged the burn.

70. After being treated onsite with rudimentary first aid for the electrocution and severe burns, Supervisor Wagoner told Plaintiff to go home. This was at approximately 2 a.m.

71. Plaintiff was in severe pain when he left work. Plaintiff went home and tried to treat the injury himself by putting burn cream on it and keeping the bandage fresh.

72. Scared to miss work, Plaintiff asked to go back to work the next day, which was a Friday, but when his supervisor asked him how he was he admitted that the injury was painful, and they told him to stay home.

73. During the week following the injury, Plaintiff went into work for his regular shift each day with a bandaged arm and in obvious pain.

74. It was clear to Defendant Palziv that Plaintiff had been severely injured and clear that his injury was likely to lead to a permanent disability restricting the use of his hand.

75. Upon information and belief, after his return to work, Defendant Palziv perceived him to be disabled and in serious need of medical care. Upon information and belief, Defendant Palziv knew that electrocution injuries commonly get worse and worse in the days and weeks after electrocution but did not tell Plaintiff same.

76. Plaintiff continued treating the injury on his own, but the pain became worse and worse. Defendant Palziv asked Plaintiff to train a new person on operating the industrial extruder that week. Plaintiff was concerned that this meant Defendant Palziv was trying to replace him and he suffered severe stress and anxiety in addition to the severe pain he was experiencing.

77. Plaintiff observed and trained the new person on the extruder but did not perform work on the extruder during the week following the accident.

78.     Plaintiff learned that Defendant Palziv called a person out to inspect the machine after his injury.  The repair person called onto the scene verified that Plaintiff properly switched off the machine, but that machine was still receiving electricity. Defendant thought it was important to have its machine checked out, but did not find it important to have Plaintiff examined.

79.     Supervisor Wagoner did not report Plaintiff's injury to OSHA or any other state or federal agency.  Upon information and belief, Defendant Palziv never created a record of the incident and covered it up to avoid paying Plaintiff worker's compensation for an injury he sustained while working.

80.     Upon information and belief, Defendant follows the relevant laws when White employees are injured and sends them for treatment.

## Defendant Terminates Plaintiff's Employment
## While He Is On Pre-approved Vacation Leave

81.     Plaintiff was relieved that he had a previously scheduled vacation coming up the following week because his injury was so severe and he knew he needed to rest and go to the doctor but he was too afraid to miss work otherwise.

82.     On or around August 31, 2022, while Plaintiff was out on his previously scheduled paid time off, Plaintiff received a call from his son, who shockingly reported that he had just been terminated for supposedly having too many points. Upon information and belief, Plaintiff's son did not have too many points. Suddenly, Plaintiff's other line rang and he saw that it was Defendant Palziv.

83.     HR Rep Newton called Plaintiff and told him she was terminating his employment. Plaintiff could not believe that HR Rep Newton was firing him while he was out on paid vacation and only a week and a half after he was injured on the job at Defendant Palziv.

84.     When he asked why HR Rep Newton was firing him, sure enough, she claimed that his tardiness had led to too many points.   When Plaintiff asked what dates he was late, HR Rep Newton refused to produce evidence of the actual dates and claimed that the date was sometime in April, nearly five months prior to his termination.

85.     HR Rep Newton finished the call by hanging up on Plaintiff before he could ask any more questions.

86.     Defendant Palziv refused to pay him his vacation time or his accrued PTO.

87.     Upon information and belief, neither Plaintiff nor his son would have been fired if they were White. Upon information and belief, Plaintiff's son's firing was associational and racial discrimination and retaliation.

**Plaintiff Complains to HR Manager Newton's Supervisor
That His Firing Was Discriminatory**

88.     For two days following his termination, Plaintiff went to great lengths to contact Defendant Palziv.

89.     First, he attempted to call the human resources department to ask if he could come into work to discuss what happened.  HR Rep Newton got on the phone and in a rude, demeaning, and authoritative voice and told him not to come to Defendant Palziv.

90.     Next, he attempted to contact Defendant Palziv's plant manager, Marko Zivkovic (hereafter "Plant Manager Zivkovic"), a White male, in order to inform him that he believed his termination to be rooted in discrimination based on his perceived disability and his race. Plaintiff called a different number at Defendant Palziv and asked for Plant Manager Zivkovic.

91.     Somehow, HR Rep Newton intercepted the phone call and nastily told Plaintiff "Never to call that number again."

92.    Plaintiff persisted in calling different numbers until he finally spoke to Plant Manager Zivkovic. Plant Manager Zivkovic told Plaintiff that he heard about the "near miss" incident at work and said that "What Robin [HR Rep Newton] says goes" and hung up on Plaintiff.

93.    Plant Manager Zivkovic refused to listen to Plaintiff in accordance with Defendant Palziv's policy that Black employees don't matter and should not be afforded fairness.

94.    Finally, Plaintiff's wife, attempted to call Defendant Palziv's CEO, Paul. She left him a message, but he never returned the call.

## Plaintiff Seeks Treatment for his Work Injury

95.    On or around September 8, 2022, after weeks of bandaging and applying burn cream, the pain from Plaintiff's work injury became unbearable and he was forced to go to a nearby emergency room for treatment.

96.    The physician at the emergency room was surprised that Plaintiff had not come in sooner. She told Plaintiff that Defendant Palziv should have immediately reported his injury and sent him to a company physician for treatment because electrocutions can affect people even more severely as time goes on. Plaintiff should have been treated and monitored by a physician starting on the date of the injury. Plaintiff had a CT Scan in the emergency room which showed a fracture in his hand.

97.    The emergency room physician told Plaintiff that he needed surgery and gave him a recommendation for a surgeon for a follow-up consult.

98.    Plaintiff was incredulous after the emergency room visit because he realized that HR Rep Newton fired him on the final day of the month and Defendant Palziv terminated his health insurance benefits that same day. Plaintiff no longer had health insurance and could not afford COBRA. He could not afford the physician to fully treat his work injury or get the surgery

required to fix his hand. To date, Plaintiff is still in severe pain from the severe injury he sustained while working for Defendant Palziv.

<u>**COUNT I**</u>
**VIOLATION OF THE NORTH CAROLINA RETALIATORY EMPLOYMENT DISCRIMINATION ACT**

99.     Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

100.    Plaintiff suffered an injury in the workplace as heretofore alleged.  Plaintiff's actions as set forth in the above paragraphs, constitute acts protected from discrimination under N.C. Gen. Stat. § 95-241(a)(1)(a), in that Plaintiff in good faith did or threatened to initiate an inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to Chapter 97 of the General Statutes of North Carolina.

101.    Based upon the nature of Plaintiff's injuries, Defendant Palziv anticipated that he would file a workers' compensation claim.

102.    Just ten (10) days after Plaintiff's workplace injury, Defendant Palziv terminated his employment as a result of his anticipated worker's compensation claim.

103.    Defendant Palziv's termination of Plaintiff's employment was a "retaliatory action" within the meaning of N.C. Gen. Stat. § 95-240(2) and was a discriminatory act against Plaintiff, such that the termination of his employment was unlawful.

104.    Defendant Palviz's violation of REDA was willful, as set forth in  N.C. Gen. Stat. § 95-243.

105.    Accordingly, Plaintiff is entitled to lost wages, lost benefits, and other economic losses as well as treble damages pursuant to N.C. Gen. Stat. § 95-243.

**WRONGFUL DISCHARGE IN VIOLATION OF
NORTH CAROLINA PUBLIC POLICY – NORTH CAROLINA COMMON LAW**

106.    Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

107.    It is the public policy of the State of North Carolina, as expressed in, *inter alia*, N.C. Gen. Stat. § 95-240, Article I, Section 1 of the North Carolina Constitution that employees be free from retaliation in their employment for, among other things, in the event they suffer a workplace injury that may result in the filing of a worker's compensation claim

108.    Defendant Palviz's conduct in terminating Plaintiff constitutes wrongful discharge as against the public policy of the State of North Carolina.

109.    Such termination proximately caused Plaintiff to suffer emotional distress and other losses, entitling Plaintiff to compensatory damages under North Carolina law and interest pursuant to N.C. Gen. Stat. § 24-5(b).

110.    Defendant Palziv's acts constituted willful, wanton, and malicious conduct, entitling Plaintiff to punitive damages pursuant to Chapter 1D of the North Carolina General Statutes.

**COUNT III**
**DISCRIMINATION - TITLE VII OF THE CIVIL RIGHTS ACT**

111.    Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

112.    Defendant Palviz is liable to the Plaintiff for subjecting him to race discrimination and disparate treatment due to race in the terms and conditions of his employment in violation of Title VII of the Civil Rights Act of 1964.

113.    Plaintiff and other Black employees were subjected to disparate treatment.

114.     Plaintiff and other Black employees were subjected to a race based hostile work environment.

115.     As a result of Defendant Palziv's discriminatory actions. Plaintiff has suffered loss of earnings, loss of other benefits and emotional distress, in an amount exceeding $10,000.00.

116.     Plaintiff is entitled to an award of lost wages, including lost fringe benefits, which resulted from the unlawful retaliation complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## COUNT IV
## RETALIATION – TITLE VII OF THE CIVIL RIGHTS ACT

117.     Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

118.     Defendant Palviz is liable to the Plaintiff for retaliating against him for opposing practices made unlawful pursuant to Title VII.

119.     Plaintiff was subjected to disparate treatment, including suspension and discharge, in retaliation for his complaints about safety matters at the Defendant Palziv's facility, including Plaintiff's complaint to the North Carolina Department of Labor, Division of Occupational Safety and Health.

120.     As a result of Defendant Palziv's retaliatory actions. Plaintiff has suffered loss of earnings, loss of other benefits and emotional distress, in an amount exceeding $10,000.00.

121.     Plaintiff is entitled to an award of lost wages, including lost fringe benefits, which resulted from the unlawful retaliation complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## COUNT V
## DISCRIMINATION – 42 U.S.C § 1981

122.    Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

123.    As heretofore alleged, Defendant Palziv has intentionally discriminated against Plaintiff because of his race.

124.    Plaintiff is entitled to an award of lost wages, including lost fringe benefits, which resulted from the unlawful retaliation complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## COUNT VI
## RETALIATION – 42 U.S.C. § 1981

125.    Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

126.    Plaintiff has been retaliated against in response to his participation in proceedings and activities protected by § 1981, as well as to his opposition of the practices of Defendant Palziv, which violate § 1981.

127.    Plaintiff is entitled to an award of lost wages, including lost fringe benefits, which resulted from the unlawful retaliation complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## COUNT VII
## DISCRIMINATION– AMERICANS WITH DISABILITIES ACT

128.    Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

129. Defendant Palziv regarded Plaintiff as disabled because of the burn injuries he suffered in connection with his workplace injury as heretofore alleged.

130. Plaintiff was able to perform the essential functions of this position with or without a reasonable accommodation.

131. Defendant Palziv discriminated against Plaintiff on the basis of his disability, refused its obligation to honor the same, and refused to provide an accommodation, ultimately terminating his employment.

132. Plaintiff is entitled to an award of lost wages, including lost fringe benefits, which resulted from the unlawful retaliation complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, attorney's fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IN THE ALTERNATIVE NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

133. The allegations contained in Paragraphs 1 through 131 are incorporated by reference herein.

134. The conduct of Defendant Palziv in failing to take action and allowing Plaintiff to be subjected on more than an isolated occasion to racial discrimination and furthered as a result of his registering a complaint with management amounted to outrageous conduct that caused the Plaintiff to suffer severe emotional distress. Defendant Palziv's conduct as herein set out was either done negligently, with the intention of causing Plaintiff emotional distress or was done with reckless indifference to the likelihood that emotional distress might result and said emotional distress did result Plaintiff seeks compensatory damages in excess of Ten Thousand Dollars ($10,000) as Defendant Palziv acted willfully and wantonly, in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

## JURY TRIAL DEMANDED

135.     Plaintiff respectfully demands a trial by a jury of his peers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court that it:

1.     Enter a declaratory judgment that the practices complained of herein are unlawful and in violation of plaintiff's rights;

2.     Permanently enjoin the Defendant from engaging in said unlawful practices, policies, customs, and usages set forth herein and from continuing any and all other practices shown to be in violation of applicable law;

3.     Reinstate Plaintiff;

4.     Award plaintiff compensatory damages for pecuniary losses, emotional pain, and mental anguish, together with attorneys fees and the costs and disbursements of this action;

5.     Award Plaintiff punitive damages;

6.     Award Plaintiff back pay with prejudgment interest, and affirmative relief necessary to eradicate the effects of the unlawful employment practices;

7.     Grant Plaintiff a jury trial on all issues of fact, and;

8.     Grant such other relief as may be just and proper.

Respectfully submitted this 20th day of December 2023 by:

/s/ Robert Ekstrand

Robert Ekstrand N.C.  Bar. No. 26673
Ekstrand & Ekstrand LLP,
110 Swift Avenue,
Durham, North Carolina, 27705
Telephone: (919) 416-4590
Facsimile: (919) 416-4591
Email: rce@ninthstreetlaw.com

/s/ Megan S. Goddard

Megan S. Goddard
Special Appearance pending
Goddard Law PLLC
39 Broadway, Suite 1540
New York, New York 10006
Telephone: (646) 964-1178
Facsimile: (212) 208-2914
Email: Megan@goddardlawnyc.com

*Attorneys for Plaintiff*